**SO ORDERED.**

**SIGNED this 6th day of January, 2016.**

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Alice Marie Nightingale, | ) | Case No. 13-10834 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ───────────────────────── | ) | |
| | ) | |
| | ) | |
| Alice Marie Nightingale, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 13-02060 |
| | ) | |
| North Carolina State Education | ) | |
| Assistance Authority, | ) | |
| | ) | |
| Defendant. | ) | |
| ───────────────────────── | ) | |

<u>MEMORANDUM OPINION REGARDING DISCHARGE OF STUDENT LOANS</u>

This adversary proceeding came before the Court for trial on October 20, 2015, to determine the dischargeability of Plaintiff's educational loan debt held by North Carolina State Education Assistance Authority, referred to as "NCSEAA." Plaintiff's counsel, Phillip E. Bolton, and Defendant NCSEAA's counsel, Brent D. Kiziah, appeared at the trial. The Plaintiff

provided the only testimony before the Court.  For the following reasons, the Court will reopen the evidence solely for the purposes set forth herein.

On October 24, 2013, the Plaintiff commenced the current adversary proceeding by filing a Complaint [Adv. No. 13-02060, Doc. #1] (the "Complaint") seeking a discharge of educational loan debts (the "Debts") held by the Defendant.  The Complaint asserts that: (i) the Debts impose an undue hardship upon the Plaintiff; and (ii) the Debts should be discharged under 11 U.S.C. §523(a)(8).  The Defendant filed its Answer to the Complaint on November 18, 2013 [Doc. # 7] (the "Answer").

The Defendant filed a Motion for Summary Judgment on November 3, 2014 [Doc. # 19] with accompanying Brief/Memorandum [Doc. # 20] (together, "Motion for Summary Judgment").  The Court denied the Motion for Summary Judgment on March 30, 2015 [Doc. # 30], and the case proceeded to trial.  Prior to the trial, Defendant and Plaintiff filed pre-trial disclosures with the Court.  [Doc. #'s 41 and 42].  Although the Defendant's pre-trial disclosures purported to attach stipulations, including the exhibits offered by the Defendant at summary judgment, no such stipulations were attached or filed with the pre-trial disclosures.  The Plaintiff's pre-trial disclosures contained no stipulations.   At trial, the parties reported that Plaintiff had not responded to the proposed stipulations, and, therefore, no such stipulations applied.  Also prior to trial, the Plaintiff objected to the admission of an affidavit of Wayne E. Johnson, submitted with pre-trial disclosures as possible evidence to be introduced, on the grounds that there was no indication Mr. Johnson was unavailable to testify and the Plaintiff wished to cross examine the witness.  [Doc. # 43].  The affidavit was not offered into evidence at trial, and therefore the Court did not need to rule on the objection to the affidavit of Wayne E. Johnson.

FINDINGS OF FACT

Between June of 2005 and August of 2008, the Plaintiff received educational loans from the Defendant in order to pay for her master's degree at the University of North Carolina at Greensboro.  Starting in October of 2005, the Plaintiff worked as a reading resource teacher at Southeast Guilford High School in Greensboro, North Carolina.   The Plaintiff was unemployed when she first moved to Greensboro from the Bahamas and testified that she needed the license from a graduate degree in order to continue doing the type of work she previously did.

 The Plaintiff filed for bankruptcy under chapter 7 on June 25, 2013.  She received a discharge on October 7, 2013, and she filed the Complaint on October 24, 2013 seeking a discharge of the Debts, which are educational loans, held by the Defendant.[1]  At the time the Plaintiff filed her Complaint, she was making her required monthly payments on the Debts, but she predicted that she would be unable to make monthly payments on the Debts after her private disability terminated on or before June of 2014.  Under the income based repayment plan, the Plaintiff's monthly payments on the Debts were $133.31 while she was receiving disability.

At the initiation of this adversary proceeding, the Debtor resided in New Mexico with a friend.  At the time of trial, the Debtor testified she had moved to Florida to live with her adult son.  Living with her son, she pays no rent but contributes approximately $435.00 per month in food and household items in order to help her son with living expenses and support herself.  The majority of her food costs go to a specialized nutrition program called scientific eating to which the Plaintiff testified she must adhere due to numerous physical maladies.   The Plaintiff contributes approximately $125.00 to the household's costs of utilities, including electricity,

---

[1] The Complaint was originally filed against both Defendant North Carolina State Education Assistance Authority and College Foundation, Inc.  The Court granted the College Foundation, Inc.'s motion to dismiss the case only against College Foundation, Inc., on December 26, 2013. [Doc. # 12].

internet and cable.  The Plaintiff also pays $82.00 a month for a cell phone and does not have a land line.  Her current living arrangement is not permanent because her son intends to start his own family soon and will likely not have room for the Plaintiff in his home.  The Plaintiff does not currently have any prospects of future places to live as her other children live too far for relocation.

Along with a minimal amount of household expenditures, the Plaintiff's other significant expense includes $750.00 per month in medicine and medical therapy.  This amount covers supplementary insurance, monthly prescriptions, medication and therapy provided at doctor's visits, and ongoing therapy received nightly for sleep apnea.  The Plaintiff's testimony was unclear concerning her specific current medications.  She had no definite list of prescriptions and struggled to remember some of the names of the various prescriptions.

The Plaintiff spends $250.00 a month on accidental insurance and a burial fund.  She previously owned a vehicle, but she sold the vehicle while living in New Mexico and used the proceeds, $2,500.00, to move to Florida.  The Plaintiff relies upon the sporadic use of her son's car, takes public transportation, or walks when she needs to go somewhere.

The Plaintiff no longer makes regular charitable contributions to her church because of her budget.  She last made a charitable contribution in August of 2015 in the amount of $25.00. The Plaintiff does not spend any money on personal beauty or additional clothing.

The Plaintiff's income is currently fixed at $1,645.91, consisting of social security benefits and state retirement benefits.  The Plaintiff testified that she has approximately $1.91 net income at the end of every month.  She arrived at her expenses by adding up all of her medical bills per month as well as expenses necessary to live with her son.

The Plaintiff is approximately sixty-seven years old and testified that she currently has burdensome health issues, including an underactive thyroid, sleep apnea, chronic fatigue, retractable foot pain, hernia, and enzyme depletion, all of which cause her to be unable to stand for reasonable periods of time, cause extreme fatigue, and require her to maintain a rigid nutrition program in order to keep her symptoms under control, when that is possible. The Plaintiff's medical history is equally burdensome: she has gone through cancer treatment, twice and surgery once, for breast cancer. The last time she went through cancer treatment was in 2007, two years after starting her master's education and taking out student loans.

The Plaintiff has been suffering from retractable foot pain since 2011. The pain has only gotten worse despite treatment. The Plaintiff is on medication for the underactive thyroid but her stamina is worse than it used to be and she is constantly tired. Her chronic fatigue gave her good days and bad days. She is on a specialized diet to ameliorate her chronic fatigue.

The Plaintiff went on disability leave in May of 2012 after the principal at her school found out that the Plaintiff had chronic fatigue. She had been falling asleep while teaching. She had to fill out an application for disability leave which granted her disability leave until she retired in June of 2014. The Plaintiff made an application to social security around June of 2014 and began drawing her benefits at that time. Due to her retirement, she is no longer on disability payments. The Plaintiff also testified to being on worker's compensation at one point when she was in school and working due to a hematoma that could not be resolved without surgery. The Plaintiff testified that additional medical issues have arisen since she went on disability leave in 2012, including wrist issues, sleep apnea, and an untreatable hernia.

The Debtor currently is "in contact with"[2] two doctors: Dr. Gross concerning foot pain and Dr. Wanek for the chronic fatigue, sleep apnea, and hypothyroidism. Although she previously saw a specialist for sleep disorder, her treatment for apnea ceased when she moved to New Mexico.

Throughout her repayment period, the Plaintiff has stayed in contact with her loan servicer, making efforts to avoid default by going into forbearance when possible, consolidating her loans, and seeking different loan repayment options, including the income based repayment program that allowed her to make the $133.31 per month payment. The Plaintiff has not investigated a loan repayment option available through another application to the income based repayment plan ("IBRP") which would allow the Plaintiff, hypothetically, to make payments of $0.00 per month. The Plaintiff stated she did not investigate this plan because she was not aware of the details, despite the Defendant contacting the Plaintiff's counsel in an attempt to make her aware of such a program. The Plaintiff, upon being asked if she thought she might be able to make any payment on the loans, replied that she might be able to afford a $1.91 payment per month.

Prior to filing for bankruptcy, the Plaintiff paid approximately $10,349.00 in loan payments. As of the trial, the Plaintiff had paid $11,416.00 in loan payments. For certain periods after her surgery, the Debtor obtained a forbearance on her loans. At no time was the Debtor in default on repayment prior to filing for bankruptcy.

The Plaintiff's education and experience qualifies her to be a teacher. Nevertheless, she testified, and the Defendant conceded, that in her current health condition, she has no ability to obtain a teaching position. When she went on short term disability, she did not attempt to find

---

[2] The Plaintiff's testimony was unclear whether she is under current treatment by these doctors.

any other job.  Since that time, she has not applied for any other types of jobs.  She testified that she was currently physically unable to obtain employment.  She stated that her job at this time was to attempt to stay healthy.

The Plaintiff stated she did not have the $1,500.00 to pay for a medical evaluation that would determine whether her medical conditions qualify her for permanent disability.

The Defendant "had no response" to the Plaintiff's testimony regarding her medical conditions.  The Defendant merely hopes that the Plaintiff gets better and can go back to work.

The Defendant agreed that the Plaintiff had made substantial payments toward repayment and stated this was rare in a procedure for hardship discharge of educational loans.

## CONCLUSIONS OF LAW

Section 523(a)(8) of the Bankruptcy Code prevents a Debtor from obtaining a discharge of educational loans insured by a governmental unit "unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents . . . ."

Both Plaintiff and Defendant agreed that the sole issue to be determined at trial is whether or not excepting the Plaintiffs' education loans from discharge imposes an "undue hardship" upon the Plaintiff as contemplated by 11 U.S.C. § 523(a)(8).  There is no dispute that the Debts are educational loans within Section 523(a)(8).  The Debtor bears the burden of proving the Debts impose an undue hardship by a preponderance of the evidence.

The term "undue hardship" is not defined statutorily.  This Court is bound to adhere to the three pronged test for determining the presence of undue hardship as created by the Second Circuit in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d. Cir. 1987),

and adopted by the Fourth Circuit in 2005 in <u>Educ. Credit Mgmt. Corp. v. Frushour (In re</u> <u>Frushour)</u>, 433 F.3d 393, 398 (4th Cir. 2005).

Undue hardship is found under the judicially created <u>Brunner</u> standard only if a debtor can prove the following by a preponderance of the evidence:

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

<u>In re Frushour</u>, 433 F.3d at 398. Even at a hearing in which the creditor does not put forth any evidence or object to any of the debtor's testimony, the debtor bears the burden of proving that excepting the debt from discharge would be an undue hardship under section 523(a)(8). <u>See</u> <u>Educ. Mgmt. Corp. v. Waterhouse (In re Waterhouse)</u>, 333 B.R. 103, 108 (W.D.N.C. 2005). Where the debtor has not provided the court with enough evidence to overcome the substantial burden in establishing undue hardship, the creditor "is free to remain silent without fear that to do so will strengthen the debtor's case or reduce his burden." <u>Id.</u> at 19.

A crescendo of courts have recognized that the "analysis required by []<u>Brunner</u> to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised . . . ." <u>Roth v. Educ. Credit Mgmt. Corp. (In re Roth)</u>, 490 B.R. 908, 920 (9th Cir. B.A.P. 2013) (Pappas concurring). "There is merit to the argument that the rigors of the Brunner test are no longer appropriate to curb borrower abuse from a premature discharge amidst only temporary financial stress . . . Over time, courts have grafted sub-elements to each of the three parts of the Brunner test. Proof of these sub-elements may force debtors into inconsistent positions or difficult burdens of proof." <u>Wolfe v. U.S. Dept. of Educ. (In re Wolfe)</u>, 501 B.R. 426, 434 (Bankr. M.D. Fla. 2013). Paradoxes created as a result of the application of the sub-

elements of Brunner have resulted in a climate in which it seems "no educational loan could ever be discharged, because it is always possible to pay in the future should prospects improve." Krieger v. Educ. Credit Mgmt. Corp., 713 F.3d 882, 884 (7th Cir. 2013).  Nevertheless, when evaluating other opinions and the facts of each case courts should remember that "Section 523(a)(8) does not forbid discharge . . . It is important not to allow judicial glosses . . . to supersede the statute itself."  Id.  Despite these well-founded criticisms of the Brunner test as mandated in this circuit by Frushour, this Court is bound to apply the precedent of this circuit.[3]

### a.  Minimal Standard of Living

The Plaintiff has made a significant effort to minimize her living expenses, residing either with family or friends on an extremely temporary basis and paying little if any rent.  She no longer makes charitable donations, contributes minimal amounts to her son to support household utilities, and relies mostly on public transportation or walking to get to appointments and run errands.  The largest expenses in the Plaintiff's budget result from the costs of monthly medical treatment, including dietary needs and daily medication.  The Plaintiff has essentially been relying for years on her family members and friends to maintain even a minimal standard of living.

Although the Defendant pointed out that some accommodations available to the Debtor, such as internet and a laptop, go above what might be considered a minimal standard of living by

---

[3] The test for undue hardship developed in Brunner was created under a prior version of the United States Bankruptcy Code (the "Code").  At the time that the Third Circuit articulated the test in Brunner, which requires a certainty of helplessness for the repayment period of the loan, the Code provided that a loan could be discharged *either* if it became due five years before the date of the bankruptcy filing *or* if excepting the debt from discharge would create an undue hardship on the debtor or the debtor's dependents.  See Roth, 490 B.R. at 920-21 (Pappas, concurring).  Therefore, under this prior test, student loans could be discharged in a bankruptcy occurring at least five years after payments first became due regardless of the debtor's financial situation.  This put a relatively short outside limit on the time period during which the court would have to determine that there was a certainty of hopelessness.  Since that outside time limit has been removed (and due to myriad other economic factors and Congress's broadening of the types of loans subject to 11 U.S.C. § 523(a)(8)), the previous test makes little sense, and "the Brunner test for determining undue hardship is truly a relic of times long gone."  Id. at 920.

poverty guidelines, courts have not found expenses like internet and cable to be per se unnecessary in maintaining a minimal standard of living.  See In re Frushour, 433 F.3d at 400 ("It cannot be said that the transmission of information, whether via Internet or cable, is always unnecessary to maintain a minimal standard of living . . . [t]he undue hardship test necessarily requires a case-by-case approach to determine whether certain expenses are or are not essential for maintaining a minimal standard of living.").  Here, the Plaintiff's budget is meager and not excessive in any way.  Under these circumstances, it is reasonable for the Plaintiff, who is mostly homebound due to lack of transportation and illness, to have some mode of communicating and accessing the internet at home.  Additionally, she shares a home and utilities with her son, who assumedly also needs and utilizes the internet.  Her contribution to that utility is substitution for rent she would otherwise pay.

The Plaintiff's income is fixed, and the evidence showed and the Defendant conceded in closing arguments that, due to her medical illness, the Plaintiff is currently unable to hold any job for which she is qualified.

Prior to trial, the Defendant, through its attorney, filed an affidavit which included potential opportunities for the Plaintiff to reduce her monthly repayment of the Debts.  The witness, however, decided not to appear in court to provide testimony, and the affidavit was neither admissible nor offered as evidence.  Therefore, the unrebutted evidence demonstrated that the Plaintiff is currently incapable of making any material payment on the debts while maintaining a minimal standard of living.

10

**b.  Certainty of Hopelessness**

The second prong of the Brunner test requires that the Debtor prove additional circumstances exist that will cause the Debtor's undue hardship to persist throughout a significant portion of the repayment period.[4]

This analysis is the "heart of the Brunner test" and a "demanding requirement," <u>Frushour</u>, 433 F.3d at 401, meant to satisfy congressional intent to make discharge of a student loan more difficult than other non-excepted debt.  <u>In re Brunner</u>, 831 F.2d at 396.  "For example, although not exhaustive, a debtor might meet this test if she can show 'illness, disability, a lack of useable job skills, or the existence of a large number of dependents.'"  <u>Frushour</u>, 433 F3d at 401 (quoting <u>Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)</u>, 397 F.3d 382, 286 (6th Cir. 2005)).  The <u>Brunner</u> court acknowledged that it is difficult for a court to predict a debtor's future income, and stated such a determination should be aided by evidence of not only current inability to pay but "additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time," which would demonstrate that the debtor's present hardship was "undue."  <u>Brunner</u>, 831 F.3d at 396.  In <u>Brunner</u>, the court determined that the debtor had not established any "additional, exceptional circumstances" as she had no disability, was not elderly, and had no dependents.  <u>Id.</u>  Additionally, only ten months had passed since the debtor had graduated from her Master's program, and it did not appear that job prospects in her area of training were impossible for her to obtain.  In <u>Frushour</u>, the debtor was in her forties, had an active interior design business out of her home, had no disabilities, and cared for a single dependent.  <u>Frushour</u>, 433 F.3d at 396.  The court noted that the debtor had voluntarily taken a low paying job despite the availability of higher paying jobs due to her desire to work in the arts.

---

[4] Currently 67 years old, the Debtor now will be expected to pay, in theory, a maximum of twenty-five more years under an income contingent or income based repayment plan, assuming she continues to qualify for those plans.

Id. at 401.  Under these circumstances, the Fourth Circuit found that the debtor "provided no additional circumstances beyond the debt itself that show her hardship was undue." Id.

Cases applying Brunner have evaluated the debtor's additional circumstances and created standards and expectations of debtors seeking to establish undue hardship.  As all of these cases indicate, such an evaluation must occur on a case-by-case basis.  In re Frushour, 433 F.3d at 401.  There are no dispositive or required circumstances, but a court looks for the "certainty of hopelessness." Id.  An estimation of a debtor's ability to maintain minimal living conditions and make payments on educational loans at some point in the future should be based "on specific articulable facts, not unfounded optimism . . . ." Educational Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1307 (10th Cir. 2004) (though typically prospective undue hardship is established by medical disability, permanent disability need not be the only prerequisite to discharge a student loan debt).

In this case, the Debtor's testimony supports finding such exceptional circumstances.  The Debtor is elderly, has no job prospect in the field for which she was educated, lives on a meager budget, relies upon friends and family to provide shelter, and testified that she has additional medical disabilities that prevent her from returning to gainful employment.  The Defendant agrees that her current situation is dire and she is barely able to remain healthy and in affordable housing, much less hold down a job.  The Debtor is sixty-seven years old.  Although age alone is insufficient to establish hardship, see In re Spence, 541 F.3d 538, 544 (4th Cir. 2008), it is a factor to be considered in establishing exceptional circumstances.  See Brunner 831 F.3d at 396 (observing that the debtor had not established exceptional circumstances because she was not elderly, had no dependents, and had not established any disability).  In addition to her age, the Plaintiff testified that she has significant health issues that impact her ability to maintain

viable employment.  In fact, due to her age, fatigue, and other physical ailments, she testified that she was unable to keep her previous employment as a teacher, which was her sole reason for going back to school and taking out student loans.

The fact that she took out student loans later in life is not the sole reason for the debtor's undue hardship.  Instead, the additional circumstances that have led to the Debtor's undue hardship are the continued fights with cancer, coinciding with other illnesses that led to short term disability prior to mandatory retirement.  The Debtor's short term disability evaluation took place almost three years ago, from which she took leave from her job.  She testified that three years later, her conditions giving rise to the disability, though being treated, only had worsened, and new ailments had arisen.

The evidence indicated that the Debtor not only has no prospect of increasing income in the future, but she also will have increased costs of living.  The Debtor has little to no remaining options for housing once she no longer can reside with friends or family at little or no expense. She will have to find an affordable place to live, but her expenses will most certainly increase without a corresponding increase in her fixed benefit income.

Despite the unrebutted evidence of illness and disability, it is troubling to the Court, and at this point insurmountable, that the Plaintiff did not attempt to enter into evidence corroborating materials even though at least some such evidence apparently was available to the Debtor.  "The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his medical condition."  In re Burton, 339 B.R. 856, 874 (Bankr. E.D. Va. 2006) (discussing the paradox of requiring an impoverished debtor seeking discharge to pay for a medical professional to provide not only examination but also testimony and the court's inability to make a medical

determination based solely on self-serving testimony from the debtor).  Where the maladies of which a debtor complains are not obviously or physically manifested, the necessity for corroborating evidence is greater.  See In re Greene, 484 B.R. 98, 123 (Bankr. E.D. Va. 2012) (the need for corroborating evidence is especially acute when a debtor alleges some type of mental issue).  In cases where the disability is based on illnesses that are not obvious, a majority of courts have required corroborating evidence concerning a debtor's medical conditions.  Under this line of cases, the court must "closely scrutinize[] claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud.  Well qualified and substantiated expert testimony is essential." Burton, 339 B.R. at 874-875 (quoting Kelsey v. Great Lakes Higher Educ. Corp (In re Kelsey), 287 B.R. 132 (Bankr. D. Vt. 2001)).  Due to the paradox of an impoverished debtor seeking to pay for medical examinations and testimony, the court in Burton refused to require expert testimony in every instance.  Id. at 879 (quoting Swinney v. Academic Fin. Servs. (In re Swinney), 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001).  See also Doherty v. United Student Aid Funds, Inc. (In re Doherty), 219 B.R. 665, 669 (Bankr. W.D.N.Y. 1998) (observing that the price of medical evidence and medical testimony is often a luxury that a debtor seeking undue hardship cannot afford).  This Court agrees that corroborating evidence necessary to meet the burden of proof under the Brunner standard does not necessarily have to consist of extensive expert testimony, but the degree of corroborating evidence that is required will depend upon the particular facts of each case.  Regardless, however, there must be more than just a debtor's testimony.  The Burton court acknowledged that, if properly authenticated and admitted into evidence, letters from a treating physician could be sufficient corroborating evidence in some circumstances.  Burton, 339 B.R. at 879-80.

The requirement for corroborating evidence is necessary to prevent the possibility of "fabrication, exaggeration and fraud." In re Burton, 339 B.R. at 874. Therefore, a debtor must provide corroborative evidence to support a claim that the medical condition at issue precludes the debtor from finding or keeping employment now and in the future. No such corroborating evidence was offered at trial despite at least some such evidence being apparently available to the Plaintiff, and despite this Court's admonition of the Debtor's requirement to produce corroborating evidence at summary judgment. See In re Nightingale, 529 B.R. 641, 651 (Bankr. M.D.N.C. 2015) (citing Greene for the proposition that corroborating evidence is required at trial for a debtor to sustain her burden in establishing medical condition and disability as an additional circumstance).

When moving for summary judgment, the Defendant presented documentation that could corroborate the Plaintiff's testimony. The Court considered on summary judgment two medical reports filed with the Defendant's Motion for Summary Judgment. The first report was attached to the Defendant's memorandum in support of the motion as Exhibit 47A, the Medical Report for Disability Eligibility Review diagnosing the Debtor with Obstructive Sleep Apnea, Fatigue, and Hypothyroidism (the "Medical Report"). [Doc. # 19-7, Exhibit 47A]. The Medical Report states that the Plaintiff was totally disabled due to these diagnoses. The report states, "[a]ll combined, these conditions prevent Alice from having the strength, energy, endurance and cognitive ability to be able to perform the work." Id. Although the box is checked to indicate that this total disability was temporary, the report said that the time of her ability to return to work was "unknown." [Doc. # 19-7, Exhibit 47A]. The second report on the Plaintiff's health, submitted to the Court in Defendant's Motion for Summary Judgment as Exhibit 46, is a letter from Dr. Michael T. Gross, the Plaintiff's physical therapist. [Doc. # 19-7, Exhibit 46]. The letter was a

response to Mr. Bolton's inquiry into the care the Plaintiff received at the clinic of the University of North Carolina's Division of Physical Therapy. Dr. Gross reported that he had cared for the Plaintiff for several years in order to address retractable pain in both feet. As a result of this pain, Dr. Gross reports that the Plaintiff's balance is affected, and she has limited ability to walk long distances or stand for prolonged periods of time. Although his care included custom foot orthoses, he reported that the condition "has had a very debilitating effect on her quality of life." [Doc. # 19-7, Exhibit 46]. The Plaintiff further testified at trial that she remains "in touch with" Dr. Gross and Dr. Wanek, and had just been seen by Dr. Wanek in Chapel Hill, North Carolina immediately prior to trial. Therefore, she may remain in a position to obtain medical records or communications that might be admissible under Rules 803(4) and 1001-1004 of the Federal Rules of Evidence, and which potentially could corroborate her testimony. Had any of this evidence been presented and admitted at trial, and subject to rebuttal evidence and any applicable cross-examination, it may have been sufficient, when considered with the Plaintiff's testimony regarding the persistence of these conditions and the Plaintiff's other exceptional conditions in this case, to establish exceptional circumstances justifying a discharge the Plaintiff's loan.[5]

Similar to other courts, this Court is not unaware of the difficulties of imposing a requirement for corroborative evidence on destitute debtors such as the Plaintiff in this case. See Burton, 339 B.R. at 881. Recognizing the Plaintiff's unrebutted testimony indicates that her situation is exceptional, and that the Defendant has conceded substantial issues related to the Plaintiff's current exceptional circumstances, and subject to the Defendant having an opportunity to object and be heard, the Court will reopen the evidence pursuant to Rule 59(d), Fed. R. Civ.

---

[5] In fact, the Defendant conceded at trial that the Plaintiff was unable to perform any work in her current state and that there was only hope that the Plaintiff would improve at some point in the future. Nevertheless, a creditor is "free to remain silent without fear that that to do so will strengthen the debtor's case or reduce his burden." In re Waterhouse, 333 B.R. at 109.

Pro., made applicable to this adversary proceeding by Bankruptcy Rule 7059.  In the event the evidence is reopened, the Court will schedule further trial solely to permit the Plaintiff to offer corroborating evidence of the future persistence of her medical conditions for purposes of trial, and to permit the Defendant to object to its admission and/or to rebut such evidence, including further examination of the Plaintiff or other witnesses.[6]  In lieu of further trial, the Court will permit the parties to submit stipulations prior to the further trial date.

### c.  Good Faith Efforts to Repay

A court examines good faith by looking at "debtor's efforts to obtain employment, minimize income, and minimize expenses . . . .  Courts will also consider a debtor's effort—or lack thereof—to negotiate a repayment plan."  Roth v. Educ. Credit Mgmt. Corp. (In re Roth), 490 B.R. 908, 917 (9th Cir. B.A.P. 2013) (quoting Educ. Credit Mgmt. Corp v. Mason (In re Mason), 464 F.3d 878, 884 (9th Cir. 2006)).  However, failure to negotiate or accept an alternative payment is not dispositive.  In re Roth, 490 at 917.  The alternative repayment must be examined with respect to the duration of the repayment, the terms of repayment, and consequences, which include future tax liability and negative credit rating.  Id.  Other factors include whether the debtor has made any payments on the loan prior to discharge, whether the debtor has sought deferments or forbearances, the timing of the debtor's attempt to have the loan discharged, and whether the debtor's financial condition resulted from factors beyond the debtor's reasonable control.  In re Roth, 490 at 917 (internal citations omitted).  Although efforts to seek out loan options that make a debt less onerous are important considerations under this prong, no one instance is dispositive.  See In re Frushour, 433 F.3d at 402.

---

[6] The Court will not require the Plaintiff's attendance at the further hearing unless she intends to offer further testimony or the Defendant requests her presence in writing and delivered to the Plaintiff's counsel at least fourteen (14) days prior to any re-scheduled trial date.

The Plaintiff has demonstrated that she has made a good faith effort to repay her debts. The Plaintiff maintained payments throughout her repayment periods, asked for forbearance options when she was unable to pay, made efforts to consolidate, and sought other minimal repayment options to keep up payments and avoid default. Although she has not sought a repayment plan that would require her to only pay $0.00 per month, the failure to consider or participate in an income based repayment plan is not dispositive. Hooker v. Educ. Credit Mgmt. Corp. (In re Hooker), 368 B.R. 502, 505 (W.D. Va. 2007) (remanding the case for further proceedings in the bankruptcy court in order to determine more facts concerning the debtor's health as it relates to good faith repayment after the bankruptcy court found Hooker had not demonstrated good faith in repayment efforts due to the fact he did not consider or pursue an income contingent repayment plan). See also In re Abney, 540 B.R. 681, 688 (Bankr. W.D. Mo. 2015) (qualification for $0.00 IBRP does not ipso facto lead to denial of an undue hardship discharge because such a rule would deprive the court of the discretion granted by 11 U.S.C. § 523(a)(8)). Regardless, this Court previously has ruled that a repayment plan of $0.00 does not ipso facto cause a debtor to fail to satisfy the requirement that any "repayment" will not prevent the debtor from maintaining a minimal standard of living. See In re Nightingale, 529 B.R. 641, 650 (Bankr. M.D.N.C. 2015). Because the Plaintiff has made a good faith effort to repay her debts, she satisfied the third prong of the Brunner test.

## CONCLUSION

The Plaintiff has satisfied the first and third prongs of the Brunner test. She has made significant efforts to minimize her living costs, staying with friends and family members to minimize rent, selling personal property, and ending charitable contribution giving. Her previous substantial payments made on the loans, her efforts in the past to consolidate loans, her

entry into forbearance and deferment status, and her making monthly income based repayments such that she never has defaulted on the loans, all show good faith to repay the loans. Nevertheless, despite the apparent availability of corroborating evidence to be offered at trial and the Court's previous admonition, the Plaintiff did not offer sufficient evidence at trial to establish the "heart" of the Brunner test. She offered credible testimony that her disability is likely to persist into the foreseeable future. She has no ability to increase her income this point as her illnesses which caused her to be evaluated as temporarily and totally disabled have continued or worsened. The Plaintiff's testimony indicates that she will face similar if not increasing challenges in the future as she ages and depending on whether she can continue to afford to live with friends and family. Nevertheless, in order to obtain a discharge of her student loans based upon medical disability, the Plaintiff must offer some corroborating evidence of her condition and that it is likely to persist. Under the unique circumstances and record of this case, including without limitation the record previously offered by the Defendant at summary judgment and the Defendant's concessions on the record at the close of evidence at trial, the Court, subject to the opportunity for the Defendant to object and be heard, will reopen the evidence solely for the purposes set forth herein. The Defendant shall have fourteen (14) days from the date of the entry of an order hereon to object to the reopening of the evidence in this case. If an objection is filed, the Defendant shall state in the objection whether it requests a hearing on the objection. If the Plaintiff files a response to the objection, she shall include any request for a hearing in the response. Absent a request for hearing by either party, the Court will rule on any objection without a hearing. If the evidence is reopened, the Court will afford the Plaintiff the opportunity to offer further, corroborative evidence of the Plaintiff's testimony regarding her medical conditions by setting further trial date, or permitting the parties to submit stipulations in the

19

alternative within such time as provided in the Order.  See In re Honeycutt, 198 B.R. 314 (Bankr.

E.D. Ark. 1996).

[END OF DOCUMENT]